Good morning, Your Honors. May it please the Court, James Johnston on behalf of Trinita Lattimore, the plaintiff and appellant in this case. With me is my co-counsel, Kelly Chen. I'd like to request three minutes for rebuttal, if that's possible. All right. Your Honors, I think there are two primary areas where the district court erred in granting summary judgment. The first is when it determined that the evidence of pretext was insufficient to sustain my client's burden under the third prong of the McDonnell-Douglas test. And the second area is when the court held that Euramax did not have an obligation to transfer my client as an accommodation for her disability. On the pretext issue, there's an awful lot of pretext evidence in this case. I want to be clear in this case. You're only making California law claims, right? Correct. So it seems to me under the California cases, proximity of knowledge of the protected status and then the bad action is not enough to establish pretext. Do you agree? I agree. So put that aside, because this is exactly where you're heading. Tell me what other evidence of pretext there is here. Well, the first is the pretense of a job elimination. Well, it's not just a pretense. The other person got fired, too. Koopman. Yeah, understood, Your Honor. The reason that it was a pretense is because there wasn't any job elimination. My client, instead what happened was my client's job was transferred. Just so you can address this, you seem to be treating this as a reduction in force case. It doesn't seem to be that. It's a reorganization case. And so the fact that the position was retained, although at a very different place, that doesn't seem to help your case all that much, if this is truly a reorganization case. Well, Your Honor, I agree with you 100%. It's a reorganization case. I have never suggested that this was in any sense a reduction in force case. My client's job was transferred from California to another state, where she was effectively replaced by a new hire. And there are plenty of cases in California indicating that where an employee is told that her job, excuse me, that she was being terminated because her job is being eliminated, evidence that she's being replaced by a new hire, or any other evidence tending to show that the job continued as a single distinct position, constitutes evidence of pretext because it undermines the job elimination rationale. It tends to prove that that was untrue. When was the plan, the first plan, put together to terminate the positions, or fire Mr. Koopman and Ms. Lattimore? The planning for the reorganization began in January of 2016. And actually, they were identified as the two people to be fired before your client gave any information to the employer about any condition, correct? I completely disagree with that. My client and two other employees were designated as placement issues. They weren't designated as to be terminated. One of the other employees that was designated a placement issue wasn't terminated. The actual decision to terminate my client didn't occur until May 2, 2016, which was well after the company learned of her disability. OK, so what happened? They were designated as people to be transferred someplace else. Well, placement? Placement issue. I think that the evidence most reasonably supports the interpretation that that placement issue designation was a recognition that there may be an issue. There may be circumstances would have to be clarified before it could be determined. Well, see, I'm looking at the record, and this is why I'm having trouble with that. They identified placement issues, but I thought the reorganization plan, which was put together by Escobar and Branch in early 2016, identified Koopman and Lattimore as candidates for termination. Am I mistaken? There's no documentary evidence that that happened. The testimony of Koopman, excuse me, the testimony of Branch and Escobar was a little equivocal on that. But they said, yeah, we were really thinking at the time, back in January 2016, that we were really equating that with a termination decision. There's a lot of evidence. So whatever their testimony was, let's assume that before your client told anybody there of any thyroid problems, they were already looking at the issue of whether or not to maintain her in her position. I believe that's correct. That's fair, isn't it? I don't think that's fair. Well, the only extent I think that's fair is that they were, prior to learning of my client's disability, because of an impression that she had previously indicated that she was unwilling to relocate. No, this is before they learned of the disability. I understand. She had gotten poor performance scores, at least below average performance scores. And at least two people there had identified her and Mr. Koopman as candidates for some sort of action. Is that fair? That's fair. OK. But what it was is the placement issue designation, I think, is the most reasonable interpretation of why she and the two other employees, one who wasn't terminated, was designated, was that her supervisor had had a conversation with her a year and a half before the planning of this reorganization commenced, where purportedly my client said to her, I really don't want to relocate if that option is ever given to me. And I think when they did the planning of this reorganization in January, they designated her as a placement issue based on Branch's understanding that she expressed a reluctance to relocate. And all that occurred before any issue of disability arose with the company. Understood. Yes. OK. And so what happened was is, and there's other evidence of pretext. Mike, let's put aside temporal proximity. What is the other specific and substantial evidence of pretext? The pretense of a job elimination. The email from the Escobar email, the head of the Escobar, excuse me, the head of Euromax's Human Resources Department authored an email 30 days before the termination decision expressing clear displeasure at the fact that my client had requested an extension of her medical leave. I think that's evidence, clear evidence of a discriminatory animus. You combine that with both temporal proximity plus the pretense of a job elimination, I think that's more than enough evidence that should have defeated some of the judgment. Excuse me for, I guess this is what I asked before. I'm still puzzled by this phrase pretense of job elimination. It is true that the support services she was offering to, I guess it's the Fabril unit, the decision was made that that support should no longer be provided remotely. It should be provided on the scene, I guess, in Pennsylvania. So the job was eliminated to the extent it was going to be performed in California, but it was understood that it was going to be now provided in Pennsylvania. So where is there a pretense of job elimination? I don't understand. They never gave her the opportunity to transfer. They never asked her. And the record is unequivocal that had she been asked, she would have transferred. And I think that the characterization of the job being eliminated in California is a little deceptive in the sense that, I mean, let's say that the Euromax had a building across the street, and so they tell my client, we're eliminated, and then she later finds out that the job continued across the street. And then Euromax is confronted with that contradiction and says, well, we were truthful. We told you your job was being eliminated, and it was. It was moved from building A to building B. How many people were working in that job before your client and Mr. Koopman were fired? Yeah, I think there was Ms. Koopman, my client, there was Ms. Gorski. Didn't it reduce the number of people working in that job? They didn't reduce a single person. You mean that they hired a new person for everybody they fired? They did. They selected. Now my question is, how quickly after your client was terminated was her, in your view, replacement hired? Her replacement was hired. My client was terminated June 10th. By June 30th, her replacement had been hired. The replacement started between June 10th and June 30th. Ms. Koopman was terminated. She was replaced by a new hire as well. Ms. Koopman was terminated in September, as I recall. Exactly. But my clients, the person who effectively replaced my client started within 20 days of my client's termination. Now let's go back to, your client had at one point said to management, I don't want to relocate. Or words to that effect. I'm not trying, I'm not purporting to quote her. Did they have an obligation to ask again? In other words, under what law do they have an obligation when somebody has said, I don't want to relocate, to say to them, are you sure? Well, I think, I don't think it comes under a particular law. I think it goes to the issue of whether the reason given was, geographic challenge was a reason given that she was selected for. There was a geographic change. You don't dispute that. There wasn't really, because my client would have accepted it. Would have accepted it, but the job wasn't where she was. Agreed. OK. And she had said, I won't relocate. She had said it previously. Are they required to go back to her and say, are you sure? Maybe look at it this way. Let's say that there had never been any discussion at all of my client relocating. And when they were planning this reorganization, Ms. Branch, her supervisor said, you know, I just have a hunch that she probably doesn't want to relocate because I know she has family in California. And I just have a hunch that she's not willing to relocate. Then they go ahead and terminate her employment for a geographic challenge without ever asking her. Well, that's what I'm asking. So take out for a second the disability discrimination aspect of this case. Am I required to say to somebody, even if they haven't said anything to me, I'm moving the job to Georgia. You have to, you know, I have to offer it to you before I offer it to anybody in Georgia. No. There's no legal requirement. But where it's relevant is if you fail to ask the person if they want to transfer under circumstances that suggest that in the normal course of events you would, that's evidence of pretext because it tends to undermine the stated reason for the termination. What's the evidence in a normal course of events that if I had an employee in California and wanted the job instead to be done in Georgia that I would offer it to her? What's the evidence in this case in that? Well, first of all, that's relevant to two separate issues. It's relevant to pretext, but it's also relevant to the duty to accommodate. There is a duty for Euromax to transfer her to the vacant position as an accommodation. Only if you, your second part of your argument is dependent on your first, is it not? Because after all, if this were simply a reorganization done for business purposes and they were changing the job to somewhere someplace else, they wouldn't have to make the accommodation. If the job was terminated, they wouldn't have to accommodate her, correct? Right, but it wasn't terminated. And it's undisputed that they hired a new employee, Mr. Howard, who started between June 10 and June 30. That was a vacant position. And under the Fair Employment and Housing Act, it's right in the statute. They had an obligation to consider that as a reasonable accommodation, placing my client into the vacant position. And since that was really the only available combination, they were required to do that unless they could show undue hardship, which there's no evidence of at all. And not only that, my client was entitled to preference for that position under the Jensen and Barnett cases, the only limitation being that under the Barnett decision, her preference can't conflict with an established seniority system. But number one, Euromax doesn't have an established seniority system. But number two, my client was replaced by a new hire. The person who filled that vacant position had just been hired, so my client would have had seniority over him. Counsel, was Ms. Koopman, was she given an opportunity to transfer? That's a point I raised in my brief. That's unknown because there's no evidence of that that was presented. There's no evidence in the record that she was ever asked whether she would be willing to relocate. Of course, Ms. Koopman. Well, that's something that could have strengthened your case considerably, right? Or weakened it. I mean, it's an important fact to know, is it not? Well, I think it could be a relevant fact. I'm not sure if it's material because of the evidence of pretext in this case. I don't think that the district court could have properly granted summary judgment just because one person had been let go for legitimate reasons, and an equal number, in this case, one more employee was let go for discriminatory reasons. I don't think that an employer can immunize himself from a claim of discrimination. That's under the California Supreme Court decision in Goosby-Vectil, where the court said that an employer can't use a reorganization as a convenient opportunity to rid itself of employees who are protected under the Fair Employment and Housing Act. And another thing, Ms. Koopsman. Well, counsel, you're over your time. And so why don't I give you two minutes to respond in rebuttal. Thank you. Good morning, Your Honors. May it please the court. I'm Josh Rodin, counsel, on behalf of Defendant Appley, Euromax International. I think that we've all been focusing on the right thing so far, which is whether or not there's been an adequate showing of pretext. And the district court's decision, I think, was correct in concluding that the plaintiff in this case didn't make a showing of specific and substantial evidence of pretext. That there are things around the margins that plaintiff has alluded to that I think that we can effectively rebut. But rebuttal doesn't help you, does it? In other words, this is a summary judgment, so we have to take them into light most favorable to the other side. To the extent that the facts that are adduced by the other side are what the other side represents. Well, so here are facts that I think they adduce. So tell me why they don't amount to. Your client, the non-pretextual reason given by your client for termination was that we've made a reorganization. Correct. And we've moved, you know, and therefore the job you have no longer exists. Correct. But somebody was hired within 30 days to do a job that seems very much like the job that she did, albeit in a different place. This is where there's a problem. So why isn't that enough evidence? You may have taken notice that a number of times during opposing counsel's argument, he used the expression effectively replaced. And opposing counsel would have the court believe that the hiring of Mr. Howard in Norcross constituted Ms. Lattimore's replacement, which is factually completely incorrect. Didn't he end up doing all of her job? No, he did none of it. Ms. Lattimore's job was entirely assumed by Ms. Gartsky, who was already employed in Pennsylvania. As part of the- I think why he's using effectively replaces, as I understand it, she took on Lattimore's job, and then he took on Gartsky's job. That is the argument that's made in the briefing, and that's how he gets to the effectively replaced. The reason I take issue with this, though, is that the reorganization contemplated that the job in California would be eliminated and that the duties that were being performed for the Fabrau business unit would be performed where the Fabrau business unit was. Wasn't that really the- I mean, to me, the genesis of this thing was that she was working from home, and at one point, Euromax asked her to go into the local Euromax offices to work there as support, because that was a problem. I don't know if it was- not sure what you mean by placement problem, but it seems my inference, which could be wrong, is that it's a problem to have your support staff be across the country from where the people are doing their work. There were two separate issues here, Your Honor. There was the issue of Ms. Lattimore working from home, and the parties do have a dispute as to whether she had permission to be working from home or not, but that doesn't ultimately factor into- What does placement problem mean, then? That was a function- That was before the reorganization plan. That's right, and the reason that she was so designated is if you look at the performance evaluations, well, I don't mean to suggest that she was a poor performer, but she was poor in some respects, and one of the respects in which she was a poor performer, she was identified by the folks she was servicing in the Fabrau business unit as not providing them with the support that they wanted, and they occasionally went to outside sources to receive the support that Ms. Lattimore was supposed to be providing. So when you combine that issue with some of her other performance issues, which, again, were issues kind of around the margins- Well, why is that a placement problem? That's the question Judge Ward last- Yeah, I still don't know what he means by it. I view this as being some peculiar nomenclature, but what I understand it to mean based on the testimony of Ms. Branch and Ms. Escobar and their depositions is that it would be difficult to move the person elsewhere in the organization because of the issues that they are having. See, the way I read it was in light of her previous- They're talking about reorganization. They're talking about moving jobs around, and she's already told them she doesn't want to move, so I thought that's what placement problem meant, but you think it means something different. There is a geographic component to this, which is the same as applied to Ms. Koopmans in that she was in Canada, and that was not where the business unit was that she was servicing, but the placement issue is not, strictly speaking, referring to a physical location. It's referring to where does this person fit within the organization? Where can we place this person within the organization post-reorganization? And the people that were identified as placement issues on that chart were the folks that were perceived as being more difficult to move within the organization for a variety of reasons. Did they consider moving her to Pennsylvania to do the job that Ms. Gertzke was doing? No. And why was that? They wanted someone to be serving as the human resources manager for the Fabrau Business Unit where the Fabrau Business Unit was. Ms. Gertzke was a human resources manager at the Fabrau Business Unit. So there was already somebody in that position. She was not servicing the Fabrau Business Unit at the time, but there was no need to move Ms. Lattimore there because Ms. Gertzke was there and could be performing those functions. So the other issue, though- Excuse me, I guess I'm confused. I thought the, so what was going on in Georgia? We got, I mean, the claim is, this is in part a failure to provide a reasonable accommodation that she was denied the opportunity as an accommodation to go to Georgia. What was the, you seem to say that was a whole new job. Well, so this is- So it wouldn't really be a transfer. It was an entirely new job. Is that your argument? This is where there is a bit of conflation of the two claims, and that unnecessarily confuses things. I will tell you why. The reorganization eliminates Ms. Lattimore's job. At the time of the reorganization, there is no job in Georgia that is open. That job springs into existence as a function of the reorganization being executed. The position that becomes open in Georgia was filled by someone to serve a different business unit out of Norcross, which is the company's headquarters. Okay. The obligation, shifting gears to the accommodation issue, we have an obligation to move her into a vacant position, which there was none, as a function of the- Yeah, but the argument here is, I take it from the other side, that a vacant position became available pretty quickly. And so why isn't that some evidence of pretext that you waited to create the vacant position until you fired her? The position that became vacant was, I realize that this is subject to some criticism, but the position that became vacant was not servicing the Fabrau business unit. Ms. Latimer's position did not become vacant. The individual who was servicing the Fabrau business unit was Ms. Gartsky, who was already employed. And when Ms. Latimer was let go, Ms. Gartsky assumed all of those duties. So let me give you a hypothetical so you don't have to tell me these are not the facts of this case. Let's assume that she's servicing a business unit, Ms. Latimer, in California. She has a disability. You end the service of the business unit in California, but you have a vacant position serving a similar business unit in North Carolina. Under the actor, you're required to offer her that job? Yes. So why in this case, if we, you know, why in this case, if this, had this position been open on the day that she was fired, would you have the obligation to offer it to her? That might be a different circumstance. I know, that's why I said it was hypothetical. If the position existed at the time of termination, this would look a little bit different. Okay, so now they're saying, well, maybe it didn't exist on the date of termination, but it was created lickety split after termination and that's enough to get us enough evidence or pretext to require a trial. Um, I quibble with the notion that the position that was created could have been filled by Ms. Latimer, but let's say that it could have. And let's say that this position did exist on the day that she was terminated, which again, it did not. Oh, yes. If that's the only evidence here in the face of the fact that another non-disabled individual was terminated for exactly the same reasons as Ms. Latimer, when that's taken into account, that one fact that we've now talked about fails to meet the bar for specific and substantial evidence. There is another fact here that I think that we should talk about because there's some significant attention devoted to it in the briefing. And I just don't want it to go unaddressed in this setting. And that is the email. I was just going to ask about that. Why is that a stray remark? I mean, it's a direct remark on her disability and questioning almost the legitimacy of her request for FMLA relief. Well, I think that we would be benefited by actually reading the text of the email because it is significant. Actually read the text of the email. Okay. The reason that it's... The text of the text. The reason that it's a stray remark is that the email pertains to the granting of leave. It has nothing to do with the termination decision. It's passing a spurs in on her credibility because what she's really saying is, you don't get leave back time for a thyroid problem. But recall, she's already been out on leave at this point. This is a notion that the leave is going to need to be extended. And so the issue is calling into question the credibility of this request for leave. Again, Ms. Escobar says specifically in the email, do we have a doctor the company uses that we can consult with? She does not have any animus in relation to someone who is disabled, nor does she have any difficulty with someone taking a legitimate leave. I mean, I agree with Judge Wardlaw. This is a very hostile observation. I mean, it indicates that this woman's a malinger, that she is using this thyroid condition as a reason to stay home. And the woman says, I guess, plain doctor, thyroid conditions really shouldn't do that. And Ms. Escobar, she remains an important decision maker, does she not, in the termination decision? And I agree with you that she is absolutely casting aspersions in that respect. And if the claim were that the, if Ms. Lattimore's claim was that the leave was denied, or if that had happened, this is your smoking gun evidence, but the leave was granted upon the presentation of satisfactory information, that the leave was legitimately required, Escobar and Branch say, great, take your leave. So your argument is they couldn't have fired her because they thought she was disabled because they didn't think she was disabled. They did not think she was not disabled. I understand, it doesn't demonstrate any bad reason for firing her, but except, doesn't it suggest that they thought she was a malinger? No, I think that simply raising the question, one time, about whether someone's need for a leave is legitimate before somebody has been presented with the requisite information. This is all a very compressed timeframe. I mean, this observation is made not long before she finds out on the day that her family medical leave act is that she's also lost her job. And this is all happening very quickly. This observation is made a month before the decision to terminate is made. And the decision to terminate wasn't executed until the leave that had been granted had concluded. Nobody was trying to interfere with Ms. Lattimore's leave. And that's the only thing that this email goes to is questioning the legitimacy of the leave. Once it became clear that it was legitimate, they said, Ms. Lattimore, take all of the family medical leave that you're entitled to. That's the only thing that this email demonstrates. And in point of fact, while Ms. Escobar was one of the decision makers in terms of the termination, Ms. Branch was another decision maker. And I suppose it would be possible that you could attribute discriminatory animus to one and not to the other. But the reality is that Ms. Lattimore and Ms. Branch continued to text one another. They only gave her a limited extension and their rationale for the limited extension was that giving her an extension to June 30 would have been not a reasonable accommodation because they already fired her. I mean, they fired her the same day they gave her the limited extension of her FMLA. I'm afraid I'm not following. They made the determination decision a month after the request for leave was presented. And the actual termination occurred over a month after the termination decision was made. And the termination occurred when the FMLA expired. You are correct that they did not extend the leave beyond the period of FMLA. And it is or can be a reasonable accommodation in California to provide somebody with a leave beyond the period provided for under CFRA or FMLA if it will enable the person to return to work. There was no work for her to return to at that point in time because the job had been eliminated in California. The job was now in Pennsylvania. When was the decision to terminate made? I know when it was conveyed. When was the decision made that Ms. Koopman and Ms. Lattimore's would be terminated? I think that this is something that the parties disagree about. I would- Well, I wanna know what the record says. Well, what the record says is that the initial termination was contemplated in December, 2015 or January, 2016. And the decision was finalized May 2nd, 2016. What legal consequences finalization have as opposed to initial decision? Well, Plaintiff's Council would argue that if the decision is made after the company becomes aware of the disability, then they can't argue that the disability didn't factor into their calculus in deciding to terminate her. And they would say, you guys may have thought about it in January, but you didn't finalize it until after January. Before you knew about the disability. I understand that argument. I disagree with it. Yeah, I'm trying to look through the record to see whether there's any analysis of Ms. Lattimore between January and the eventual time about her job performance that might have suggested that they hadn't finally made that decision. In other words, it's one thing to say, well, if we made the decision then, but we're not gonna tell people until we get our reorganization stuff done. It's another thing to say, this is our tentative decision, but we'll keep thinking about it. This was something that the court talked about, the district court examined. It would be one thing if there had been a dramatic change in her performance evaluation that was received in 2015 versus 2016, but there was not. The performance evaluations that she received were functionally equivalent in that they both had positive things to say about her and negative things to say about her. Well, but are you suggesting that if she'd performed well during the next six months, her position wouldn't have been terminated? No, I don't think that that's the case. Okay, so why are you talking about the performance evaluations? Well, you had asked the question about whether the performance had been measured. No, I'm saying try to figure out whether or not there's some notion in this thing that this is a tentative decision, but we'll look at her situation personally and try to figure it out again later, or whether this is a pretty firm decision, but we're not gonna announce these until we put our whole plan together. I think that the evidence reflects the latter rather than the former. If you look at the testimony of Branch and Escobar, as well as the sheet that they prepared, this was their design for the reorganization. Now, keep in mind, the design has to be confirmed with a number of other people within the company. The Human Resources Department couldn't make these decisions unilaterally, but this was what was planned. All right, Counsel, you're over your time. I just have one quick last question. You know the charts that are in the record about the quadrant? When were those made? In January. In January, all right. Thank you, Counsel. Thank you. I will give you two minutes. John, it's Tim. I just have a couple points. This issue about the job, there wasn't a job vacancy when my client was terminated. There clearly was. The termination of my client created a vacancy that Euromax addressed by creating, or by hiring a new employee. That employee started between June 10th and June 30th, but they would have had to advertise for the position well before June 10th to go through the hiring process, so he actually started between June 10th and June 30th. On the issue of what date the termination decision was made, Judge Hurwitz, you asked what the record showed. Interrogatory was sent to the defense. It said, on what date was the decision made to terminate Ms. Lattimore's employment? The answer to that interrogatory was May 2nd, 2016, which is consistent with Ms. Escobar's testimony that that was the date she decided to terminate her employment. And I think that's all I have, unless there's other questions. All right, thank you, Counsel. Lattimore v. Euromax.
judges: Nguyen, Owens, Baylson